# Frank A. Mika, et al.

## v.

# Planters Bank & Trust Company of Virginia

Record No. 900844

April 19, 1991

Present: All the Justices

416

*Frank A. Mika* for appellants.

*Susan B. Read (Peter D. Menk; Black, Menk, Noland & Gaines*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

This appeal arises in a fraud action brought by a commercial bank to recover sums it paid as "cash advances" on a personal credit card. The sole issue we consider is whether the trial court erroneously admitted into evidence a letter written by the holder of the credit card who did not testify at the trial.

In November 1988, Leslie J. Blakeslee was confined in the Augusta County jail on a series of criminal charges pending in local courts. Blakeslee was employed in Georgia managing property owned by a holding company based in Kuwait.

Blakeslee asked appellant Frank A. Mika, an attorney at law, to represent him. Mika was a sole practitioner with an office in Waynesboro. Mika's only employee was appellant Tammy V. Campbell, who acted as Mika's secretary and "right arm."

On November 16, Mika interviewed Blakeslee at the jail. After discussing the need for Blakeslee to provide funds for bond and for Mika's fee, Mika agreed to represent Blakeslee. Blakeslee told Mika that he, Blakeslee, was authorized to use a credit card issued to his employer, Mohammed Afif Diab. Diab was a resident of Dubai, United Arab Emirates, and was an employee of the Bank of Oman in its Dubai branch. Blakeslee did not possess the card. He suggested to Mika that cash advances be obtained from a local bank to cover the expenses necessary for Mika to undertake the representation. Mika rejected this idea and suggested that Blakeslee contact Diab and that he ask Diab to wire funds to Mika through Western Union in Waynesboro. Blakeslee agreed.

On November 17, Mika spent the day in Richmond attending a legal education seminar. He instructed Campbell to expect a call from Western Union, to obtain the wired funds, and to deposit the money in his escrow account.

During the day, without Mika's knowledge, Blakeslee called Campbell, stating that the plans to obtain wired funds had "fallen through." Blakeslee instructed Campbell to obtain "blank cash advance forms" from a local bank so that sums could be charged

to Diab's credit card. Stating he was authorized to use Diab's card, Blakeslee furnished Campbell with the account number for a VISA credit card together with telephone numbers for Diab and the Bank of Oman, which issued the credit card, so that the authorization could be verified.

Campbell, unfamiliar with the procedure for obtaining credit-card cash advances, went to the main office in Staunton of appellee Planters Bank & Trust Company of Virginia. At the bank, Campbell obtained blank "Bankcard Cash Advance" forms, took them to the jail, and Blakeslee completed two forms for cash advances of $2,500 and $4,000. Blakeslee signed the forms and wrote Diab's name on them. Additionally, he signed a handwritten statement, notarized by Campbell, authorizing her to "pick up cash" on his behalf "relative to 2 VISA cash advances."

Campbell returned to Waynesboro and took the documents to a Planters Bank branch. There, the advances were approved and the bank deposited $6,500 to Mika's escrow account. From those funds, a check for approximately $2,200 was mailed to Atlanta at Blakeslee's request "to pay his rent."

On November 30, Mika went to the bank's Staunton office to procure additional cash advances on Diab's card, pursuant to instructions from Blakeslee, in order to provide funds to cover the amount of bail bonds fixed in connection with the criminal charges. When Mika requested blank cash advance forms to be taken to jail for Blakeslee to sign, a bank employee advised Mika that such blank forms could not be removed from the bank, and that cash advances could not properly be made unless the cardholder was present with his card. Puzzled by the apparent change in procedure by the bank, Mika returned to Waynesboro and asked Campbell to obtain the advances at the Waynesboro branch.

On December 1, Campbell went to the branch and, dealing with the same bank employee with whom she had dealt on November 17, obtained two cash advances on Diab's credit card totalling $8,000 using the same procedure employed for the initial advances.

Bonds were posted and Blakeslee was released from jail. Subsequently, he personally obtained two cash advances from the bank's Waynesboro branch on Diab's card totalling $5,500, making a total of $20,000 charged to the card.

Later, the Bank of Oman notified Planters Bank that all the charges were being refused. Neither Diab nor the Bank of Oman had been reached by telephone by any of the parties.

In January 1989, Planters Bank brought the present action against Mika, Campbell, and Blakeslee. Basing the action on actual and constructive fraud, the bank alleged the defendants misrepresented that Blakeslee was authorized to draw cash advances on Diab's credit card. The bank further alleged that prior to procuring any advances, Campbell and Mika, as well as Blakeslee, were advised by the bank's main office that, in order to process a cash advance, "the cardholder had to be present with the credit card, properly identified, and authorization from the Credit Card Center had to be obtained." The bank further alleged that, notwithstanding this information, defendants proceeded to improperly obtain cash advances from a branch of the bank without presentation of the card and in the absence of the cardholder. Thus, according to the allegations, the defendants, jointly and severally, were liable to the bank for the full amount of the advances.

Responding, Mika and Campbell denied the bank's allegations and specifically asserted that the cash advances "were duly authorized and drawn" on Diab's credit card. Blakeslee, answering the bank's allegations, contended that he had verbal authorization to use Diab's credit card.

During a November 1989 jury trial, plaintiff's exhibit 11 was offered in evidence. The exhibit includes 15 pages of various sizes joined by a staple. The first page, a printed form with blanks completed by hand, is dated in January 1989 and labelled "Charge-Back/Re-presentation Documentation Transmittal." At the foot of the page is printed "VISA INTERNATIONAL Operating Regulations." The form instructs the user to employ "this form for all Charge-Backs which require documentation and all Representations." Referring to a charge-back for Planters Bank, the form lists an amount of $4,500. Another such form carrying the same date is included in the exhibit; it refers to a like charge-back for Planters Bank in the amount of $3,500. Both of the forms, within a section titled "Second Charge-Back Reasons," contains the following entry written by hand opposite "Comments:" "Enclosed cardholder's letter." The forms are signed opposite "Prepared by:" by a person whose signature is unintelligible and who is otherwise unidentified on the form.

Also included in the exhibit are documents labelled "Merchant Advice and Checking Account Entry" showing charges totalling $20,000 against Planters Bank's account by a bank card center. Also included in the exhibit are completed "Bankcard Cash Advance" forms designated "Bank Copy," apparently signed by Blakeslee with Diab's name also written on the signature lines.

Additionally, the 15 pages include two machine copies of a typewritten letter dated December 17, 1988 written on stationery of the Khor Dubai branch of the Bank of Oman Limited. The letter is addressed to "Mr. Sarwar Ali Khan, Centre Manager, Visa Card Centre, Bank of Oman Ltd., Head Office." The letter purportedly is signed by "(Mohd Afif Diab) Asst. Chief Manager."

Referring to a specific VISA card number, the letter mentions an earlier letter concerning "erroneous . . . debits to my Visa Card account." The letter states that during the period of these debits, the writer has "remained in the town" and has not authorized "anyone to make transactions against my visa card." The writer also states that "the visa card is in my possession" and that it has not been lost or "left at any place for even a short while." The letter concludes with a request for cancellation of the card and reissuance of another.

The trial court admitted the entire exhibit in evidence through the testimony of Planters Bank's Senior Vice President and Cashier. The witness testified that the documents comprising the exhibit were bank records and "documents that were sent back to us stating that these cash advances were not honored; and its the debits coming back that's advising us that this money is removed from our account." The witness further testified that he could not verify the authenticity of the Diab letter or state that Diab personally signed it.

Trial counsel for Mika and Campbell, offering to stipulate that the advances had been rejected, objected on hearsay grounds to inclusion of the copies of the letter because the letter contained the reason for rejection, that is, use of the card was unauthorized.

Upon admission, the trial court gave what it called a "cautionary instruction" to the jury:

"Ladies . . . of the jury, this . . . Exhibit Number 11 that we've just heard some testimony about, you'll recall that as an attachment to that exhibit, there is a letter, dated Decem-

ber the seventeenth of 1988, from the Bank of Oman, which gives the reason that they rejected or kicked back this cash advance.

"Now, it's important that you remember that whether or not the reasons stated in that letter are true or false is irrelevant. It is merely offered to you to show that it was rejected and the reason for the rejection.

"So you should not consider the contents or the information of that letter . . . . In other words, the truth or falsity of that information should not be considered by you as any substantive evidence in this case. It is merely being offered to show you the reason that the cash advance was rejected."

At the conclusion of all the evidence, the court granted the bank's motion for summary judgment against Blakeslee. Accordingly, final judgment in the amount of $20,000 was entered against him, and it has become final.

The case proceeded against Mika and Campbell, with the jury finding against both in the amount of $8,000. We awarded them this appeal from the March 1990 judgment in favor of the bank in that amount, limiting the appeal to consideration of the question whether the copies of the Diab letter correctly were admitted and, if so, whether the cautionary instruction was proper.

■ On appeal, the bank advances several alternative theories to support the trial court's action in admitting the letter. The bank argues that the letter is not hearsay because it was not offered to prove the truth of its statements; that admission is authorized by statute; that admission is allowed under the modern Shopbook Rule; that admission was harmless error, if error at all; and that the court's cautionary instruction eliminated any risk of prejudice to Mika and Campbell. We do not agree with any of the bank's theories for admission. We hold that the letter was inadmissible for any of the purposes urged by the bank, and that its admission was reversible error. Consequently, we do not reach the question whether the cautionary instruction was proper.

■ Before addressing the bank's arguments specifically, we will describe what the letter is, and what it is not. The letter is a personal letter written to a VISA card center about problems the cardholder was having "regarding erroneous . . . debits to my Visa Card account," in the words of the letter writer. Contrary to

the trial court's observation in the cautionary instruction, it was not "from the Bank of Oman." It was merely an employee's personal letter written on his employer's stationery about a subject personal to the writer, even though Diab's title as "Asst. Chief Manager" was typed below his signature. The entire text of the letter deals with business personal to Diab, and not with affairs of the Bank of Oman.

■ Additionally, the letter is grouped with a series of pages tendered as one exhibit, which is described by Planters Bank as a "batch" of documents received by the bank from a bank card center in Richmond, Virginia. Two of the documents are printed forms apparently used by "VISA INTERNATIONAL" to accomplish "Charge-Backs." Those forms refer under "Comments" to "[e]nclosed cardholder's letter," the Diab letter. But it is abundantly clear that, on the question of admissibility as evidence, the letter is not an integral, inseparable part of the forms so that it must be accepted as essential proof of the "Charge-Backs." Eight of the other documents in the "batch" establish that the cash advances in issue had been rejected by the credit card network spreading from Oman to Richmond to Staunton. The documents making this clear are the two "Charge-Back" forms and six forms labelled "Merchant Advice and Checking Account Entry." And, Mika and Campbell did not object to receipt of those documents in evidence.

■ The importance of the Diab letter cannot be overstated. One element of the bank's fraud case against Mika and Campbell required proof that Blakeslee was not authorized to charge against Diab's card. The bank attempts to avoid this conclusion by arguing that its case against Mika and Campbell depended entirely on proof that employees at the Waynesboro branch were duped by Mika and Campbell into approving cash advances when Mika and Campbell knew, because of what they had been told at the Staunton office, that no cash advance could be processed without the presence of the cardholder and his card. The fact remains, however, that if, in fact, the charges were authorized by Diab, as the defendants' evidence showed, the bank would have had no case against Mika or Campbell, even though Waynesboro bank employees may have disregarded the bank's own rules pertaining to cash advances.

■ Against this background, we consider whether the letter was admissible under the modern Shopbook Rule, adopted in Vir-

ginia as a recognized exception to the hearsay rule, allowing admission in evidence of verified regular entries, without requiring proof of the original observers or record keepers. *See Ford Motor Co.* v. *Phelps*, 239 Va. 272, 275, 389 S.E.2d 454, 457 (1990). We conclude that the letter is not the type of "verified regular entry" contemplated by the Shopbook Rule. It was not an "entry" in Planters Bank's records. It was not an "entry" in the Bank of Oman's records. It was merely incorporated by reference in one of a "batch" of documents gathered together by a credit card center to justify a "Charge-Back." This incorporation by reference was utterly insufficient as a guarantee of trustworthiness or reliability to warrant admission of this hearsay document.

■ The bank's statutory argument relies on Code § 8.3-510. That statute allows for creation of a presumption of dishonor by introduction into evidence of one of the following:

> "(b) the purported stamp or writing of the drawee, payor bank or presenting bank on the instrument or accompanying it stating that acceptance or payment has been refused for reasons consistent with dishonor;

> "(c) any book or record of the drawee, payor bank, or any collecting bank kept in the usual course of business which shows dishonor, even though there is no evidence of who made the entry."

We are of opinion that the statute does not apply under these circumstances.* Diab's personal letter to a bank card center fails to qualify as a stamp or writing "of the drawee, payor bank or presenting bank," according to subsection (b) of the statute. Moreover, the letter is not "any book or record of the drawee, payor bank, or any collecting bank kept in the usual course of business," within the meaning of subsection (c), for the reasons we addressed when dealing with the Shopbook Rule.

■ Finally, we conclude that the letter was, in fact, submitted to prove the truth of its essential content, and that the error in

---

* Parenthetically, we will not discuss the questions (because they have not been debated by the parties) whether a "Bankcard Cash Advance" form is an "instrument" within the meaning of Virginia's Uniform Commercial Code (" 'Instrument' means a negotiable instrument." Code § 8.3-102(1)(e)), or whether a "Charge-Back" of a credit card cash advance amounts to a "dishonor" within the meaning of the Code. See § 8.3-507(1) ("An instrument is dishonored when . . . .").

admission of the letter was not harmless. The letter comprised the only proof that Blakeslee was not authorized by Diab to charge against the credit card. Hence, its admission was highly prejudicial to Mika and Campbell.

Consequently, the judgment of the trial court will be reversed. Because the inadmissible letter constituted the only proof of an essential element of the bank's case, the claim against Mika and Campbell fails for lack of proof. Thus, final judgment will be entered here in their favor.

*Reversed and final judgment.*